# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

BALL AEROSOL AND SPECIALTY )
CONTAINER, INC. )
                                  )
              Plaintiff, )
                                  )
           v. )      No.  05 C 3684
                                  )
LIMITED BRANDS, INC., )
et al., )
                                  )
           Defendants. )

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

       This matter is before the court on Plaintiff Ball Aerosol and Specialty
Container, Inc.'s ("BASC") motion for summary judgment on the issue of patent
damages.  This matter is also before the court on Defendant Limited Brands, Inc.'s
("Limited"), Defendant Bath & Body Works, Inc.'s ("BBW"), Defendant Henri
Bendel, Inc.'s ("Bendel"), and Defendant Bath & Body Works, Inc. D/B/A/ The
White Barn Candle Co.'s (collectively referred to as "Limited Defendants") motion
for summary judgment on the issue of patent damages.  For the reasons stated below,
we grant BASC's motion for summary judgment and deny Limited Defendants'
motion for summary judgment.

# BACKGROUND

BASC alleges that U.S. Can Company, Inc., BASC's predecessor, is the assignee of U.S. Patent No. 6,457,969 ("'969 Patent"). Claims 1 and 5 of the '969 Patent generally cover a candle tin comprised of a hollow candle holder in which a candle is placed and a cover that, when the candle is lit, is to be used as a base upon which to place the candle so that heat transferred through the bottom of the candle tin does not scorch the surface that the candle tin would otherwise be placed upon. BBW and Bendel began selling the Henri Bendel Home Scented Travel Candle ("Accused Candle Tin") in March and April of 2004, respectively. Bendel purchased the Accused Candle Tin from BBW up to the Fall of 2005, and BBW has stopped manufacturing the Accused Candle Tin.

BASC brought the instant patent infringement action against Limited Defendants, alleging that the Accused Candle Tin infringes claims 1 and 5 of the '969 Patent. On April 19, 2006, we construed the terms "Protrusions Formed," "Seat," and "Cup Shaped." On June 28, 2006, this court granted summary judgment to BASC, finding the '969 Patent valid and Limited Defendants to be infringing the '969 Patent. BASC and Limited Defendants move for summary judgment on the issue of patent damages.

# LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In seeking a grant of summary judgment the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)).  This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Id.* at 325.  Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986.  The court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson*, 477 U.S. at 255.

## DISCUSSION

BASC argues that it is entitled to $1,425,523 in lost royalties trebled to

$4,276,569 from BBW for sales on the Accused Candle Tin from March 2004 through June 24, 2007.  BASC also contends that it is entitled to $49,697 in lost royalties from Bendel, which should be trebled to $149,091.  BASC also claims that it is entitled to prejudgment interest.  Limited Defendants argue that an award of damages is inappropriate.  Limited Defendants also argue alternatively that, if the court awards damages to BASC, damages should be measured by BASC's lost profits on the tin component and subsequently limited to one-seventh of the total, which equals an approximate royalty rate of 1%.

Damages for patent infringement are governed by Title 35, United States Code, Section 284 ("Section 284"), which is intended to "ensure that the patent owner would in fact receive full compensation for 'any damages' he suffered as a result of the infringement."  *SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*, 926 F.2d 1161, 1164 (Fed. Cir. 1991)(quoting *General Motors Corp.*, 461 U.S. at 654-55 (1983)).  The appropriate amount of damages is a factual determination for which "the plaintiff bears the burden of proof by a preponderance of the evidence."  *Smithkline Diagnostics, Inc.*, 926 F.2d at 1164; *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1370 (Fed. Cir. 2002).

A court may divide damages between lost profits "to the extent they are proven" by the plaintiff, "and a reasonable royalty for the remainder."  *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577 (Fed. Cir. 1989).  Lost profits are the profits that a patentee would have enjoyed "but for" the infringement by the defendant.  *Micro Chemical, Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed. Cir.

2003). Once the patentee has shown that an inference of "but for" causation is reasonable, "the burden shifts to the infringer to show that the inference is unreasonable for some or all of the lost profits." *Id*. While there are multiple ways to satisfy this "but-for" test for causation, the most common method is to prove the four factors provided in *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152 (6th Cir. 1978) ("*Panduit* Test"). *See Micro Chemical, Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003)(stating that "the *Panduit* [Test is a] recognized method[] of showing 'but for' causation" in regard to damages).

If lost profits cannot be proved to a reasonable probability, the patentee may instead pursue reasonable royalties. *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995)(citing *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983). Reasonable royalties provide the minimum guaranteed damages a patentee may be awarded for infringement. 35 U.S.C. § 284. A reasonable royalty is commonly defined as the amount that would have been agreed upon had there been a hypothetical negotiation, often called a "'willing licensor/willing licensee' negotiation," between a willing patentee and a willing potential user "at the time the infringement began." *Rite-Hite Corp.*, 56 F.3d at 1554; *Minco, Inc. v. Combustion Engineering, Inc.*, 95 F.3d 1109, 1119 (Fed. Cir. 1996)(stating that "this hypothetical construct seeks the percentage of sales or profit likely to have induced the hypothetical negotiators to license use of the invention"). Such a determination should not be made in hindsight, but rather courts should only look at what the parties would have considered at the time of the hypothetical

negotiation.  *Hanson*, 718 F.2d at 1081.  To determine the amount of royalties that would have induced the parties to buy or sell a license at the time the infringement began, the Federal Circuit endorses, among other methods, the fifteen factor-approach first set out in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D. N.Y. 1970)("*Georgia-Pacific* Factors"), which is discussed below.  *See Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003)(stating that "factors relevant in a reasonable royalty determination using [the hypothetical negotiation] method include those set out in *Georgia-Pacific*").

I.  Measure of Damages

Limited Defendants argue that the calculation of BASC's lost profits on sales of the tin component of the Accused Candle Tin is the most accurate method of determining damages to compensate BASC for Limited Defendants' infringement of the '969 Patent.  BASC contends that the best calculation of damages should be determined based on a reasonable royalty rate.  Section 284 states, in part:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

35 U.S.C. § 284.  A district court has discretion "both in selecting the methodology for and in calculating a damage award."  *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1579 (Fed. Cir. 1996); *see also Fromson v. Western Litho Plate & Supply Co.*, 853

F.2d 1568, 1576 (Fed. Cir. 1988)(overruled on other grounds)(noting that "[a]ssessing and computing damages under 35 U.S.C. § 284 is a matter within the sound discretion of the district court").  As noted above, the two typical measures of monetary damages in patent cases are lost profits and reasonable royalties.  *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002).  A reasonable royalty calculation is appropriate when the patent owner has not sold the patented invention in the United States, thereby making lost profits undeterminable.  *See Trell v. Marlee Elecs. Corp.*, 912 F.2d 1443, 1445 (Fed. Cir. 1990)(stating that "[b]ecause [the patent owner] did not sell its invention in the United States, he could not seek damages on the basis of lost profits").  In the instant action, the undisputed evidence shows, and both parties agree, that BASC does not make or sell the patented invention.  Therefore, a reasonable royalty, rather than lost profits, is the correct measure of damages.

## II.  Damages Apportionment

Limited Defendants argue that the amount of damages awarded to BASC should be reduced to one-seventh of the total damages award available since the Accused Candle Tin infringes in only one out of its seven possible configurations. Section 284 compensates a patent owner with "a reasonable royalty for the use of the invention by the infringer."  35 U.S.C. § 284.  The Federal Circuit has clarified that Section 284 is intended to "ensure that the patent owner would in fact receive full compensation for 'any damages' he suffered as a result of the infringement."

*SmithKline Diagnostics, Inc.*, 926 F.2d at 1164 (quoting *General Motors Corp.*, 461 U.S. at 654-55). In order to determine the scope of the infringer's "use" of the invention that requires compensation, the district court will look at the claim construction used during the infringement proceedings. *See Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1364 (Fed. Cir. 2004)(declining "the invitation to apply a different claim construction for computation of damages than for infringement liability").

Limited Defendants attempt to reassert their non-infringement theory that their product is capable of infringing only one out of the seven possible configurations in the '969 Patent. In *Metabolite*, the infringer argued during the damages stage of litigation that damages should only be assessed for the patented tests that resulted in an assay with an elevated parameter level, even though the infringement was found regardless of the assay result, which was defined in the claim construction during the infringement proceedings. *Id*. The Federal Circuit rejected the infringer's limited damages argument and held that the base damages included all tests that infringed. *Id*. In the instant action, this court expressly declined to adopt the one-in-seven configuration infringement theory put forward by Limited Defendants and found that the Accused Candle Tin was capable of infringing regardless of its configuration during use. As such, we decline to revisit the claim construction used in this court's infringement decision, and this court does not adopt Limited Defendants' damages theory. *See id*. (declining "the invitation to apply a different claim construction for computation of damages than for infringement liability").

Limited Defendants also rely on a damages apportionment theory to rationalize limiting the damage calculation to one-seventh of the total amount of damages. Limited Defendants cite *Oak Industries, Inc. v. Zenith Electronics Corp.,* 726 F. Supp. 1525 (D. Ill. 1989), in support of their proposition that this court should limit the amount of damages. In *Oak*, the court assessed damages based only on those devices that actually infringed by using a patented method. *Id*. at 1543. However, the damages apportionment theory in *Oak* applies to devices that are not capable of being used only to infringe a patented method, but are also capable of being used in a non-infringing manner. *Id*. Unlike in *Oak*, where a method patent was the basis for the litigation, the patent on the apparatus itself was the basis for the action taken against Limited Defendants, and the '969 Patent covers the entire candle holder apparatus and protects the entire value of the product. Therefore, a damages apportionment theory is inappropriate and this court will base the calculation of damages on all Accused Candle Tins sold by Limited Defendants.

III.  Notice Requirement

BASC and Limited Defendants disagree as to whether BASC gave Limited Defendants notice of their infringement. To recover damages for infringement that occurred prior to the filing of a lawsuit, a patent owner must comply with the marking or actual notice requirements of Title 35, United States Code, Section 287(a) ("Section 287(a)"). If a patent owner does not make or sell the patented invention and, as such, is unable to physically mark the product, then the patent

owner must give an infringer actual notice. *Texas Digital Sys., Inc. v. Telegenix Inc.*, 308 F.3d 1193, 1219-20 (Fed. Cir. 2002). This notice requirement goes beyond simply informing a potential infringer of the existence of a patent, but instead "requires the affirmative communication [by the patent owner] of a specific charge of infringement by a specific accused product or device." *Amsted Indus. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994). The issue of notice is proper for summary judgment when no reasonable trier of fact could find that the patentee either has or has not provided actual notice to the "'particular defendants by informing them of his patent and of their infringement of it.'" *Gart v. Logitech*, Inc., 254 F.3d 1334, 1339 (Fed. Cir. 2001)(quoting *Amsted Indus.*, 24 F.3d at 187).

BASC argues that it provided Limited Defendants with actual notice in October 2003 when Mallory Bonpua ("Bonpua"), BBW's Senior Sourcing Manager, received an email from BASC indicating that the footed square candle tin that Limited Defendants intended to include in their Accused Candle Tin product was covered by the '969 Patent. Limited Defendants contend that the email did not constitute actual notice of infringement since Bonpua was not a corporate representative. However, we agree with BASC. In addition to the email, a copy of the patent was faxed to Bonpua. BASC informed Limited Defendants of the '969 Patent by the email and fax to Bonpua, which informed Limited Defendants that only BASC could make the footed candle tin due to the '969 Patent. Such communication was sufficient to put Limited Defendants on actual notice of patent infringement. Therefore, the period of infringement that requires compensation begins in March

2004, when Limited Defendants began selling the Accused Candle Tin, through June 24, 2007, the last date of sales figures provided by Limited Defendants.

## IV.  *Georgia-Pacific* Factors

When an established royalty rate does not exist, a court will determine a reasonable royalty based on "hypothetical negotiations between the plaintiff and defendant . . . at the time the infringement began."  *Rite-Hite Corp.*, 56 F.3d at 1554 (Fed. Cir. 1995).  In addition, "reasonable royalty damages are not calculated in a vacuum without consideration of the infringement being redressed."  *Applied Med. Res. Corp. v. United States Surgical Corp.*, 435 F.3d 1356, 1361 (Fed. Cir. 2006). The Federal Circuit endorses the *Georgia-Pacific* Factors for determining the amount of royalties that would have induced the parties to buy or sell a license at the time the infringement began.  *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003)(stating that "[f]actors relevant in a reasonable royalty . . . include those set out in *Georgia-Pacific*").  The *Georgia-Pacific* Factors are: (1) "The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty" ("*Georgia-Pacific* Factor 1"); (2) "The rates paid by the licensee for the use of other patents comparable to the patent in suit" ("*Georgia-Pacific* Factor 2"); (3) "The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold" ("*Georgia-Pacific* Factor 3"); (4) "The licensor's established policy and marketing program to maintain his

patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly" ("*Georgia-Pacific* Factor 4"); (5) "The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter" ("*Georgia-Pacific* Factor 5"); (6) "The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales" ("*Georgia-Pacific* Factor 6"); (7) "The duration of the patent and the term of the license" ("*Georgia-Pacific* Factor 7"); (8) "The established profitability of the product made under the patent; its commercial success; and its current popularity" ("*Georgia-Pacific* Factor 8"); (9) "The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results" ("*Georgia-Pacific* Factor 9"); (10) "The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention" ("*Georgia-Pacific* Factor 10"); (11) "The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use" ("*Georgia-Pacific* Factor 11"); (12) "The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions" ("*Georgia-Pacific* Factor 12"); (13) "The portion of the realizable profit that should be credited to the invention as distinguished from non-

patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer" ("*Georgia-Pacific* Factor 13"); (14) "The opinion testimony of qualified experts" ("*Georgia-Pacific* Factor 14"); and (15) "The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee -- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention -- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license" ("*Georgia-Pacific* Factor 15").  *Georgia-Pacific Corp.*, 318 F. Supp. at 1120.

### A.  *Georgia-Pacific* Factor 1

BASC contends that it has never licensed the '969 Patent, but that it has granted an implied license to make the patented invention when the candle tin component is purchased from BASC.  (Hoffman Dec. Par. 34).  Limited Defendants argue that BASC's approximate profit of eleven cents from selling the tin component equals the implied license royalty rate that BASC has accepted and, as such, represents an established royalty for licensing the '969 Patent.  (Fern Decl. Par. 18-20).  An established royalty is one that the industry generally accepts for the type of patent in litigation proceedings.  *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d

1075, 1078 (Fed. Cir. 1983)(noting that "[f]or a royalty to be 'established,' it 'must be paid by such a number of persons as to indicate a general acquiescence in its reasonableness by those who have occasion to use the invention'")(quoting *Rude v. Westcott*, 130 U.S. 152, 165 (1889)).  Limited Defendants have not provided evidence to support their proposition that the candle industry would accept an eleven cent royalty as reasonable for the '969 Patent that includes the complete candleholder with a candle.  However, the undisputed evidence shows that, at most, the eleven cent rate proposed by Limited Defendants has been established for the candle tin component only.  In addition, Limited Defendants admit that they did not have knowledge of BASC's supposed implied license when discussing notice of the '969 Patent, yet for this factor Limited Defendants use the implied license in an attempt to extrapolate an established royalty rate for the entire patent from the profit of selling a single component.  Therefore, no established royalty rate exists and *Georgia-Pacific* Factor 1 is neutral.


B.  *Georgia-Pacific* Factor 2

BASC contends that Limited Defendants have not produced patents comparable to the patent at issue.  Limited Defendants argue that BBW's licensing agreements for personal care products with royalties ranging from 1% to 6% are evidence that BBW would not have paid more than a 6% royalty for the '969 Patent.  However, Limited Defendants failed to produce these license agreements until after the close of discovery and have failed to provide substantial justification for this

failure in accordance with Federal Rule of Civil Procedure 37(c)(1).  Also, Limited

Defendants have failed to explain how the products or technology that it licenses for

royalties of between 1% and 6% are comparable to the '969 Patent.  Therefore, the

above-referenced licenses will not be considered and *Georgia-Pacific* Factor 2 is

neutral.


### C.  *Georgia-Pacific* Factor 3

BASC argues that it would have granted Limited Defendants an unlimited

nonexclusive right to the '969 Patent and an exclusive license for square-shaped

products.  Limited Defendants contend that they would not gain a competitive

advantage from an exclusive license for square-shaped products.  The undisputed

evidence shows that there is no advantage to the square-shaped products.  Therefore,

the reasonable royalty will be calculated as if a nonexclusive license were agreed

upon by the parties, which will result in a lower royalty rate.


### D.  *Georgia-Pacific* Factor 4

BASC argues that it has never licensed the '969 Patent to a manufacturer that

did not buy the tin component from BASC.  BASC further indicates that it was not

its policy to be the sole provider of the tin component.  BASC also contends that a

license, implied or otherwise, has never existed for square tins.  Limited Defendants

counter that *Georgia-Pacific* Factor 4 has no influence on the royalty rate since

BASC granted implied licenses and BASC had not previously licensed or produced

square tins.  However, the undisputed evidence shows that BASC's licensing history supports the proposition that BASC intended to be the sole provider of tins used in the '969 Patent.  The only licenses that BASC granted were under the condition that manufacturers buy the tin component from BASC.  BASC's preservation of its exclusive right over the patented invention equates to a higher royalty rate.  This higher rate would have been necessary to induce BASC to grant a nonexclusive license to the '969 Patent that would allow Limited Defendants to purchase the tin component from other manufactures.

E.  *Georgia-Pacific* Factor 5

BASC argues that, although it does not directly compete in the same market as Limited Defendants, BASC does compete with companies from which Limited Defendants purchased candle tins.  Limited Defendants contend that they do not compete with BASC, but rather that BASC competes with other suppliers for the business of Limited Defendants.  The undisputed evidence shows that although BASC and Limited Defendants do not compete in the product market for the product that each manufactures, the product that BASC has patented does compete with the products that Limited Defendants sell.  This indirect competition results in an increased interest by Limited Defendants in obtaining a license from BASC and the relationship between BASC and Limited Defendants is more akin to inventor-promoter than direct competitors in view of the patented technology.  Therefore, the royalty associated with the license would need to be low enough for Limited

16

Defendants to manufacture and promote the product in competition with other candle sellers and, as such, *Georgia-Pacific* Factor 5 is neutral.

### F.  *Georgia-Pacific* Factor 6

BASC contends that the Accused Candle Tin assisted Limited Defendants in the sale of other non-patented items by employing marketing strategies such as providing customers with the Accused Candle Tin at no cost after customers purchased a non-Accused Candle Tin, selling the Accused Candle Tin at a discounted rate to customers that purchased a non-Accused Candle Tin, and offering a leather travel case to customers for the Accused Candle Tin.  BASC further claims that the profits from Limited Defendants' selling strategies were accounted for in Limited Defendants' financial records by attributing the complete sale to non-infringing items and recording the profit for the Accused Candle Tin as zero dollars. Limited Defendants argue that BASC did not generate any other sales by selling the tin component of the patented invention, but admit that this factor may increase the royalty rate.  (Fern Dec. Par. 29-30).  The Federal Circuit has found that convoyed sales are generally appropriate for damages under a lost profits calculation but that such sales should not be credited to a patent owner who does not sell the patented invention.  *See  Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1393 (Fed. Cir. 2003)(finding that the district court's ruling that the patent holder "could not include sales of non-patented items in the royalty base but could demonstrate that those sales were relevant in determining a reasonable royalty" was "consistent with [Factor 6] of

the Georgia-Pacific factors"); *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568 (Fed. Cir. 1984)(holding that profits from the sale of non-patented eyeglasses displayed on infringing display racks were relevant to determining a reasonable royalty). In the instant action, the royalty rate should not reflect the profits attributable to the non-infringing unpatented products. However, the Accused Candle Tin was marketed with non-infringing products, such as a travel case or non-Accused Candle Tins, which, in turn, increased the overall sales to Limited Defendants and, therefore, the value of a license of the '969 Patent and the corresponding royalty rate is increased.

### G. *Georgia-Pacific* Factor 7

The undisputed evidence shows that any license for the patented invention, whether exclusive or nonexclusive, would have been for the term of the patent, which is sixteen years from the date of first infringement. The Federal Circuit has held that long licenses can weigh in favor of a higher royalty rate. *See Brunswick Corp. v. United States*, 36 Fed. Cl. 204, 214 (Ct. Cl. 1996)(stating that "Factor 7 embodies the conventional wisdom that the longer the remaining duration of a patent term, the more willing a hypothetical licensee is to pay a higher royalty rate"); *but see Georgia-Pacific*, 318 F.Supp. at 1126 (noting that "the opportunity to engage in the sale of a patented product even several years before the patent's expiration would constitute a definite advantage to [the patent holder] who intended to market the product after the expiration of the patent").

### H. *Georgia-Pacific* Factor 8

BASC contends that the Accused Candle Tin generated a profit of approximately $5.2 million, which includes convoyed sales, at an average profit margin of approximately 78%. Limited Defendants claim that the Accused Candle Tin, with a gross profit of 75%, was not a profitable product, which is evidenced by Limited Defendants' decision to discontinue selling the Accused Candle Tin. As noted above in *Georgia-Pacific* Factor 6, the profit from convoyed sales is not a factor of the reasonable royalty calculation. At the time of the hypothetical negotiation, the undisputed evidence shows that Limited Defendants expected that the Accused Candle Tin would result in a profit margin of 80.1%. An actual profit of 75%, which approaches, but does not exceed, the expected profit, weighs in favor of a lower royalty rate. However, the undisputed evidence shows that the popularity of the Accused Candle Tin increased, with a greater number of sales of the Accused Candle Tin by Limited Defendants from January 2006 through June 2006 than were sold by Limited Defendants in all of 2005. This increase in popularity negates the downward influence on the royalty rate created by the actual profit of the Accused Candle Tin. Therefore, the multiple points mentioned above neutralize *Georgia-Pacific* Factor 8 and do not impact the hypothetical reasonable royalty rate.

### I. *Georgia-Pacific* Factor 9

BASC claims that the patented invention provides improved air circulation and dissipation of heat, which thereby prevents damage to surfaces where the product

is placed.  Limited Defendants argue that BASC cannot show that there was

customer demand for the patented features, which Limited Defendants refer to as

"feet" on the candle tin.  (D Resp. 10).  As noted above, the '969 Patent covers the

complete candleholder combination and not merely the "feet," tin, or any other single

part.  The undisputed evidence shows that Limited Defendants do not sell candles

without "feet" or without a cover to dissipate heat, which is evidence that there is a

greater demand for the candle holder combination covered by the '969 Patent than

for a flat bottom candle that cannot dissipate heat.  Therefore, *Georgia-Pacific* Factor

9 has an upward influence on the reasonable royalty rate.


### J.  *Georgia-Pacific* Factor 10

BASC argues that the nature of the patented invention, is the combination of

all the components that make up the Accused Candle Tin and, although BASC does

not make the complete product, BASC's damages award should not be limited by the

components it manufactures.  Limited Defendants argue that the licensor's

commercial embodiment is only the tin component that BASC manufactures.  As

noted above, BASC does not make the patented invention and, therefore, there is no

licensor commercial embodiment.  BASC should not be penalized for merely making

a component of their patented invention.  The nature of the patented invention, which

includes the entire candle with wick and holder combination, weighs in favor of a

higher royalty rate.

K.  *Georgia-Pacific* Factor 11

BASC contends that Limited Defendants sold approximately $7.0 million worth of the Accused Candle Tin and that Limited Defendants' marketing strategies are evidence that Limited Defendants used the Accused Candle Tin as part of a business plan to sell other products.  Limited Defendants argue that approximately $4.0 million worth of the Accused Candle Tin were sold at a profit advantage of 2.29% over a ten ounce non-infringing glass candle and that, as such, BASC would have had little incentive to license the patented invention.  However, Limited Defendants' comparison of the Accused Candle Tin to the ten ounce non-infringing glass candle has no value since the undisputed evidence shows that there are distinct advantages to the Accused Candle Tin over a glass candle.  The undisputed evidence also shows that Limited Defendants sold the Accused Candle Tin as a unique item and created different marketing strategies and promotions with the Accused Candle Tin as the base product.  Therefore, Limited Defendants' various uses of the Accused Candle Tin lead to an upward influence on the royalty rate.


L.  *Georgia-Pacific* Factor 12

The undisputed evidence shows, and BASC and Limited Defendants agree, that no industry royalty rate exists for a comparable invention.  Therefore, *Georgia-Pacific* Factor 12 is neutral.

### M.  *Georgia-Pacific* Factor 13

BASC argues that little investment and low risk existed for Limited Defendants to produce the Accused Candle Tin since Limited Defendants previously succeeded in selling round candles made from tins bought from BASC.  Limited Defendants argue that the patented "feet" of the candle were not sales drivers of the Accused Candle Tin.  As noted throughout this memorandum opinion, the '969 Patent covers the entire Accused Candle Tin.  In addition, the risk of marketing the Accused Candle Tin was low due to the previous success of similar products.  However, when a consumer purchases a candle, factors such as fragrance, packaging, and brand reputation are not covered by the '969 Patent.  Therefore, *Georgia-Pacific* Factor 13 has a downward influence on the royalty rate.

### N.  *Georgia-Pacific* Factor 14

BASC and Limited Defendants have both presented qualified experts to support their respective opinions.  Therefore, *Georgia-Pacific* Factor 14 is neutral.

### O.  *Georgia-Pacific* Factor 15

BASC argues that a base royalty rate of 17% would have been reached during a negotiation and that the court should increase the royalty rate to 21.25% in order to fairly compensate BASC for the imposition of a compulsory license on the patented invention.  Limited Defendants contend that a royalty rate of 0.25% would have been reached between the parties.  An infringer should not benefit from paying only a

reasonable royalty after it has infringed a patent owner's rights in a valid patent. *See TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 900 (Fed. Cir. 1986)(noting that the patent owner "might have agreed to a lesser royalty is of little relevance, for to look only at that question would be to pretend that the infringement never happened"). The undisputed evidence shows that at the time of infringement, Limited Defendants purchased candleholder tins from a supplier other than BASC and that the option for Limited Defendants to buy the tin component from BASC, thereby receiving an implied license, was not a viable option. As a result, BASC was in a superior negotiating position and a reasonable royalty of 17% could have been reached between the parties. However, if Limited Defendants were to pay only what would have been negotiated before the infringement began, such a royalty rate "would also make an election to infringe a handy means for competitors to impose a 'compulsory license' policy upon every patent owner." *Panduit Corp.*, 575 F.2d at 1158. Thus, applying the *Georgia-Pacific* Factors in the instant action, an increased royalty rate of 20% is appropriate.


P.  Amount of Base Damages

The undisputed evidence shows that the total sales of the Accused Candle Tin by BBW from March 2004 through June 24, 2007, totaled $6,708,342. The undisputed evidence also shows that the total sales of the Accused Candle Tin by Bendel through June 24, 2007, totaled $233,873. Based on the analysis above and applying a royalty rate of 20%, the resulting base damages award to BASC totals

$1,341,668 as to BBW, and $46,774 as to Bendel.

## V.  Enhanced Damages

BASC argues that it is entitled to enhanced damages since Limited Defendants willfully infringed the '969 Patent.  It is within the court's discretion to increase an award of compensatory damages "up to three times the amount found or assessed." 35 U.S.C. § 284.  In determining whether an award of damages should be increased, (1) a factual determination is made as to "whether an infringer is guilty of conduct upon which increased damages may be based," and (2) "[i]f so, the court then determines, exercising its sound discretion, whether, and to what extent, to increase the damages award given the totality of the circumstances."  *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1570 (Fed. Cir. 1996)(citing *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826-27 (Fed. Cir. 1992)).

### A.  Conduct

BASC argues that Limited Defendants willfully infringed the '969 Patent. Enhanced damages may be based on a finding of willful infringement.  *See Jurgens*, 80 F.3d at 1570(stating that ""[a]n act of willful infringement satisfies this culpability requirement and is, without doubt, sufficient to meet the first requirement to increase a compensatory damages award).  An infringer willfully infringes when the infringer does not have "sound reason to believe that it had the right to act in the manner that was found to be infringing."  *SRI Int'l v. Advanced Tech. Lab.*, 127 F.3d

1462, 1464-1465 (Fed. Cir. 1997). After an infringer has actual notice of another's patent, the infringer has an affirmative duty to avoid violating the rights granted by that patent. *Amsted*, 24 F.3d 181. This "affirmative duty will normally entail the obtaining of competent legal advice before engaging in any potentially infringing activity or continuing such activity." *Spindelfabrik Suessen-Schurr Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 829 F.2d 1075, 1084 (Fed. Cir. 1987). Although an infringer is not required to obtain an opinion from counsel, if the infringer does obtain an opinion it may elect to assert reliance on advice-of-counsel as an affirmative defense. *See Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1344 (Fed. Cir. 2004)(stating that "[a]lthough the duty to respect the law is undiminished, no adverse inference shall arise from invocation of the attorney-client and/or work product privilege"). The burden of proving willful infringement is on the patent owner by clear and convincing evidence. *Braun, Inc. v. Dynamics Corp. of America*, 975 F.2d 815, 822 (Fed. Cir. 1992). BASC argues that Limited Defendants willfully infringed the '969 Patent because Limited Defendants did not attempt to design around the '969 Patent but rather that Limited Defendants proceeded with making the Accused Candle Tin using schematics that BASC had assisted Limited Defendants in designing, because Limited Defendants waived the advice-of-counsel defense, and because Limited Defendants continued to sell the Accused Candle Tin even after this court found that Limited Defendants were infringing the '969 Patent.

Limited Defendants rely on the advice-of-counsel affirmative defense to

support a finding by this court that they did not willfully infringe the '969 Patent.

We disagree. As noted above, Limited Defendants had notice of the '969 Patent, and

their potential infringement of the '969 Patent, on October 9, 2003. In addition, the

undisputed evidence shows that Bonpua could not recall whether he spoke with

counsel upon receiving the '969 Patent, (Bonpua Dep. 42), and, as such, there is no

evidence that Limited Defendants did or did not base their conclusion of non-

infringement on any sound reason or competent advice at that time. In addition, the

undisputed evidence shows that Limited Defendants made and sold the Accused

Candle Tin beginning in March 2004 and that on September 8, 2004, BASC sent

Limited Defendants an infringement letter ("Infringement Letter"). After Limited

Defendants received the Infringement Letter, the undisputed evidence shows that

Limited Defendants sought advice of counsel. However, on November 29, 2005, this

court ordered Limited Defendants to advise BASC whether Limited Defendants

would assert an advice-of-counsel defense during litigation. On December 10, 2005,

Limited Defendants sent an email to BASC that stated:

> Pursuant to the Court's Order, this is to provide [Limited Defendants']
> decision regarding the reliance on any opinions of counsel. Initially, we note
> that none of [Limited Defendants] infringe any valid claim of the patent-in-
> suit. Accordingly, [Limited Defendants] have no present intention of asserting
> the advice of counsel at trial.

(P Ex. 11). Based upon this email, no evidence exists that Limited Defendants based

their conclusion of non-infringement on sound reasoning or competent legal advice.

In addition, it is proper for a district court to set a date by which the defendant must

inform the plaintiff whether the defendant will elect to assert the advice-of-counsel defense at trial. *See, e.g., In re Buspirone Patent & Antitrust Litig.*, 210 F.R.D. 43, 55 (S.D.N.Y. 2002)(stating that a defendant "must clearly elect whether it will raise an advice-of-counsel defense before the close of discovery and in time to allow for such discovery"). Thus, Limited Defendants may not escape liability by asserting a defense that it waived.

Even though Limited Defendants may not now rely on an advice-of-counsel defense, BASC has not produced clear and convincing evidence that shows that Limited Defendants did not have sound reason to believe that Limited Defendants could not produce the Accused Candle Tin prior to this court's finding of infringement against Limited Defendants. The undisputed evidence shows that Limited Defendants' position, prior to this court's decision as to infringement, is comprised of letters sent from Limited Defendants to counsel for BASC stating that Limited Defendants believed that Limited Defendants could not infringe unless proof existed that the Accused Candle Tin was used in a certain configuration. The argument by Limited Defendants is, in effect, that no infringement could occur without a finding of infringement by the court. Such an argument is flawed.

On June 28, 2006, this court granted summary judgment to BASC, finding Limited Defendants to be infringing the '969 Patent. The undisputed evidence shows that on June 30, 2006, BASC sent a letter to Limited Defendants which stated that BASC was aware that Limited Defendants continued to sell the Accused Candle Tin and BASC demanded that Limited Defendants cease and desist all sales of the

27

Accused Candle Tin ("Cease & Desist Letter"). Limited Defendants acknowledged acceptance of this letter and represented to BASC and to this court in Limited Defendants' response to BASC's initial motion for summary judgment on the issue of damages that the Accused Candle Tin was no longer being sold by Limited Defendants as of July 31, 2006. (Doc. 183, 185)(including Lucas Dec. 6 and Brennan Dec. 7). Although such a time period would have been appropriate given the number of stores owned by Limited Defendants, the undisputed evidence shows that BBW continued to sell the Accused Candle Tin until June 24, 2007, and that Bendel continued to sell the Accused Candle Tin until April 2007, long after receiving the Cease & Desist Letter. In addition, the undisputed evidence shows that during this time period BBW had total sales for the Accused Candle Tin in the amount of $282,722, and Bendel's total sales of the Accused Candle Tin totaled $5,281. Regardless of Limited Defendants' belief about what constituted infringement of the '969 Patent, Limited Defendants continued to sell the Accused Candle Tin close to one year after this court found Limited Defendant to be infringing. Therefore, no reasonable jury could find other than that clear and convincing evidence exists that Limited Defendants were willfully infringing the '969 Patent and the amount of damages awarded to BASC should be enhanced.

### B. Amount of Enhanced Damages

BASC argues that the award of damages should be trebled. The Federal Circuit in *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992), identified the

following nine factors for the district court to consider when determining whether enhanced damages are appropriate given the totality of the circumstances: (1) "whether the infringer deliberately copied the ideas or design of another" ("*Read* Factor 1"); (2) "whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed" ("*Read* Factor 2"); (3) "the infringer's behavior as a party to the litigation" ("*Read* Factor 3"); (4) the "[d]efendant's size and financial condition" ("*Read* Factor 4"); (5) the "[c]loseness of the case" ("*Read* Factor 5"); (6) the "[d]uration of defendant's misconduct" ("*Read* Factor 6"); (7) the "[r]emedial action by the defendant" ("*Read* Factor 7"); (8) the "[d]efendant's motivation for harm" ("*Read* Factor 8"); and (9) "whether [the] defendant attempted to conceal its misconduct" ("*Read* Factor 9"). *Id.* at 828; *see Hockerson-Halberstadt, Inc. v. Propet USA, Inc.*, 62 Fed. Appx. 322, 332 (Fed. Cir. 2003)(applying factors and discussing goals of enhanced damages). Limited Defendants contend that an enhancement of the damages award is inappropriate.


1. *Read* Factor 1

The undisputed evidence shows that BBW designed the Accused Candle Tin. The undisputed evidence further shows that Limited Defendants were not aware of the '969 Patent prior to October 2003. Therefore, Limited Defendants could not have copied the '969 Patent, and *Read* Factor 1 does not weigh in favor of enhanced damages.

## 2.  *Read* Factor 2

The undisputed evidence shows that after Limited Defendants had actual notice of the '969 Patent, Limited Defendants did not investigate the scope of the '969 Patent in order to form a good-faith belief that the '969 Patent was invalid or that Limited Defendants were not infringing BASC's patented invention.  Further, Limited Defendants base their entire argument for *Read* Factor 2 on the communication between counsel for BASC and counsel for Limited Defendants.  However, communication between counsel of a plaintiff and counsel of a defendant does not show that a defendant had a good faith belief that a defendant's actions did not violate another's valid patent rights.  *Read* Factor 2, at the very least, calls for evidence of communication between Limited Defendants and legal counsel.  Not only do Limited Defendants fail to produce any evidence of such communication, but, as noted above, Limited Defendants elected to waive an advice-of-counsel defense, and the court will not consider any opinions Limited Defendants received from counsel.  Also, the communications referenced by Limited Defendants merely address non-infringement and do not suggest that the '969 Patent is invalid.  Therefore, the undisputed evidence shows that Limited Defendants did not have a good faith belief that the '969 Patent was invalid prior to presenting the argument to this court, and *Read* Factor 2 weighs in favor of treble damages.

### 3.  *Read* Factor 3

Although the behavior and tone between both BASC and Limited Defendants could have been more cooperative, the litigation tactics that both parties engaged in do not merit an increase in the award of damages in the instant action.

### 4.  *Read* Factor 4

The undisputed evidence shows that Limited Defendants' size and financial condition are such that an increase in the award of damages would not cause unreasonable harm in light of the other factors being considered.  For example, Limited Defendants reported sales of $9.699 billion and operating profits of $986 million for the 2005 fiscal year and $10.671 billion in sales with $1.76 billion in operating profits during the 2006 fiscal year.  In addition, BBW reported sales of $2.285 billion and $403 million in operating profits for the 2005 fiscal year and sales of $2.556 billion and $1.76 billion in operating profits for the 2006 fiscal year. Further, Bendel reported $40 million in sales for the 2005 fiscal year.  Limited Defendants fail to present any arguments that their size and financial condition would leave them unable to absorb an award of damages that exceeds compensatory damages.  Instead, Limited Defendants point to the success and profit margin that Limited Defendants achieved for the Accused Candle Tin.  However, the success and profit margin realized by Limited Defendants has been considered in other parts of this memorandum opinion and such arguments are not relevant to *Read* Factor 4. Therefore, *Read* Factor 4 weighs in favor of enhanced damages.

### 5. *Read* Factor 5

BASC argues that this was not a close case because it was decided on summary judgment.  Limited Defendants argue that this was a close case because Limited Defendants presented sound arguments for invalidity and non-infringement.  We find that the underlying infringement action was not a close one.  While this court's memorandum opinion on infringement addresses Limited Defendants' arguments as to the validity and infringement of the '969 Patent, it should be noted that Limited Defendants did not argue that the Accused Candle Tin lacked any of the claimed elements.  Instead, Limited Defendants argued that the Accused Candle Tin had to be modified in order to be infringed.  However, the modification required a simple rearrangement of elements already present.  Therefore, the instant infringement action was not a close one, and *Read* Factor 5 weighs in favor of enhanced damages.

### 6. *Read* Factor 6

The undisputed evidence shows that Limited Defendants' misconduct was ongoing for approximately two years after Limited Defendants had notice of the '969 Patent.  During this time, Limited Defendants continued to use the Accused Candle Tin to promote and increase sales of other products, such as the leather traveling case and non-Accused Candle Tins.  In addition, Limited Defendants continued to sell the Accused Candle Tin for approximately one year after this court found that Limited Defendants infringed the '969 Patent.  The long duration and extensiveness of

Limited Defendants' misconduct weighs in favor of enhanced damages.

### 7. *Read* Factor 7

The undisputed evidence shows, and both parties agree, that no remedial action was taken by Limited Defendants. Limited Defendants contend that no remedial action was warranted since the Accused Candle Tin had many non-infringing uses. However, not only do Limited Defendants incorrectly interpret how the Accused Candle Tin infringes, Limited Defendants fail to state any other reason as to why they did not take remedial action. Instead, Limited Defendants continued to sell the Accused Candle Tin after this court's memorandum opinion which found that Limited Defendants were infringing BASC's patented invention. Therefore, a lack of any remedial action by Limited Defendants, as well as the willful infringement after this court's memorandum opinion, weigh in favor of enhanced damages.

### 8. *Read* Factor 8

The undisputed evidence shows, and both parties agree, that there is no clear evidence of a motivation by Limited Defendants to harm BASC. In addition, BASC and Limited Defendants had a previous customer-suppler relationship that was not a source of resentment between the parties. Therefore, *Read* Factor 8 weighs in favor of not awarding enhanced damages.

9. *Read* Factor 9

BASC contends that Limited Defendants attempted to conceal their misconduct. However, the undisputed evidence shows otherwise. BASC admits that Limited Defendants have been cooperative during production of financial records, including the production of sales totals for the Accused Candle Tin after July 31, 2006. In addition, although Limited Defendants discussed producing a square candle tin with BASC prior to discussions with another tin supplier, such discussions are not evidence that Limited Defendants "duped," (P Mot. 14), BASC into assisting Limited Defendants. Competitive bidding is a part of every business relationship, and BASC does not have a valid patented right to any discussions about the Accused Candle Tin; BASC has only the right to the patented invention.

10. Amount of Damages Based on Totality of the Circumstances

Based on the analysis above, an award of enhanced damages is appropriate. We find that damages attributable to sales of the Accused Candle Tin for the time period prior to July 31, 2006, $6,425,620 as to BBW and $228,592 as to Bendel, will be doubled. In addition, we find that treble damages are appropriate for the time period between August 1, 2006, and June 24, 2007, which equals $282,722 as to BBW and $5,281 as to Bendel. Therefore, the total amount of damages awarded to BASC at a 20% royalty rate with enhanced damages is $2,739,881 as to BBW and $94,605 as to Bendel.

## VI.  Prejudgment Interest

BASC argues that it is entitled to prejudgment interest.  However, BASC has failed to comply with Local Rule 56.1 in showing that it should be awarded prejudgment interest.  BASC points the court to an attached declaration, which contains "the proper measure of prejudgment interest."  (P Mot. 15).  The attached declaration merely states an amount of prejudgment interest and notes that the proper calculation is contained in attachments to the declaration.  BASC bears the burden of proving the proper calculation of prejudgment interest, and a court is not "obliged in our adversary system to scour the record looking for factual disputes and may adopt local rules reasonably designed to streamline the resolution of summary judgment motions."  *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920, 922 (7th Cir. 1994)(stating in addition that a local rule pertaining to summary judgment "is more than a technicality").  Further, the Seventh Circuit has held that "a district court is entitled to expect strict compliance with Rule 56.1."  *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004)(stating that "[s]ubstantial compliance is not strict compliance").  Therefore, no prejudgment interest has been shown to be warranted.

**CONCLUSION**

Based on the foregoing reasons, we grant BASC's motion for summary judgment on the issue of patent damages and deny Limited Defendants' motion for summary judgment on the issue of patent damages.  In addition, we award BASC total damages in the amount of $2,739,881 as to BBW and total damages in the amount of $94,605 as to Bendel.


_Samuel Der-Yeghiayan_
Samuel Der-Yeghiayan
United States District Court Judge


Dated: September 4, 2007